IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

GERALD E. BUTLER,

    Plaintiff,

v.                                        CASE NO. 1:07-cv-22-SPM-GRJ

JOHN E. POTTER, POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

Pending before the Court is Defendant's Motion For Summary Judgment. (Doc. 73.) Plaintiff has filed a response, and therefore the motion is ripe for consideration. (Doc. 90.) For the reasons discussed below, Defendant's Motion For Summary Judgment (Doc. 73) is due to be **GRANTED.**

**I. BACKGROUND**

Plaintiff, proceeding *pro se*, initiated this case on February 9, 2007 by filing an employment discrimination complaint form naming John E. Potter, Postmaster General, United States Postal Service, as a Defendant. (Doc. 1.) Plaintiff amended his complaint twice. The Second Amended Complaint again named John E. Potter, Postmaster General, United States Postal Service as a Defendant.[1] Plaintiff brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII") alleging that Defendant discriminated against him because of Plaintiff's gender, race, color, disability, and age

---

[1] Plaintiff also included William Burrus, President of the American Postal Workers Union, and the American Postal Workers Union as Defendants in the Second Amended Complaint. (Doc. 29.) The claims against those Defendants were dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim by prior Order of this Court. (Doc. 62.)

and that Defendant retaliated against him. (Doc. 29.; Doc. 90, Attachment 1, p. 1.) Plaintiff received the necessary Dismissal and Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC") on July 26, 2007, a copy of which he filed with the Second Amended Complaint.  (Doc. 29 Att. 2.)

Plaintiff was employed by the Postal Service as a mail processing clerk in Gainesville, Florida.   In that capacity, Plaintiff worked from 3:30 p.m. to 12:00 a.m. Monday through Friday and had the weekends off.  (Doc. 73, Att. 1.) In addition to his position with the Postal Service, Plaintiff also had a contract with the *Gainesville Sun* to haul and deliver newspapers 365 days annually.  (Doc. 73, Att. 4.)  Pursuant to his contract with the *Sun*, Plaintiff would haul newspapers in bulk from a printing plant to a central distribution center that was located in a parking garage near Shands Hospital at the University of Florida in Gainesville, Florida.  Plaintiff would normally pick up the newspapers from the printing plant shortly after midnight and then unload the newspapers at the parking garage and other couriers would then deliver the newspapers to subscribers.  (Doc. 73, Att. 5.)

Plaintiff has a health condition, edema or excessive swelling in his left leg, that requires him to periodically elevate and place cold compresses on his left leg.  (Doc. 73, Att. 3.)  As a result of his left leg condition, Plaintiff applied for and was granted leave under the Family and Medical Leave Act ("FMLA") by the Postal Service.  Plaintiff was assigned FMLA identification #1606256, which Plaintiff was to use whenever he requested leave under the FMLA due to his left leg condition.  (Doc. 73, Att. 2.)

In April 2006, Plaintiff submitted four FMLA leave requests to the Postal Service for April 11, April 12, April 13, and April 14.  (Doc. 73, Att. 6).  On the evening of April

12, 2006 and early morning hours of April 13, 2006, surveillance was conducted by Special Agent Rebecca Hall of the Postal Service Office of the Inspector General and Injury Compensation Specialist (ICS) Robert Young at the parking garage where Plaintiff dropped off newspapers each morning. Plaintiff was observed arriving at the parking garage at 12:40 a.m. on April 13, 2006 and then unloading bundles of newspapers from his van. Plaintiff finished unloading the newspapers at 1:18 a.m. (Doc. 73, Att. 5.)

On April 19, 2006, Special Agent Young and ICS Hall showed videotape and photographs of Plaintiff that were taken during the April 13, 2006 surveillance to Certified Nurse Practitioner Beverly Nelson, one of Plaintiff's treating medical providers. Ms Nelson and Dr. Osvaldo Rodriguez, one of Plaintiff's treating physicians, signed a letter that included the following:

> The person in the videotape was identified as Gerald Butler, employee of the Postal Service and known patient of mine for several years. He is currently under FMLA for recurrent swelling of his LLE due to old chronic compound fracture. In accordance with the FMLA document, during periods of increased edema and pain in his left leg, Gerald was to elevate his extremity, apply compression stockings to reduce the swelling, and take medication to promote resolution of the edema. In the videotape, the subject is seen lifting bundles of what appear to be newspapers into a van. This is in violation of the terms of the FMLA document which defines specific guidelines regarding the periods of increased swelling. . .If indeed the person identified as Gerald Butler was using FMLA as the basis for a sick day on April 13, 2006 and was performing in the manner showed in the video and on still photographs, he was clearly not in compliance with the terms outlined in the FMLA.

(Doc. 73, Att. 9.)

Special Agent Hall and ICS Young attempted to interview Plaintiff that same day, April 19, 2006, at approximately 9:30 p.m. regarding possible abuse of FMLA leave.

Plaintiff was accompanied by an American Postal Workers Union ("APWU") shop steward during the interview and was advised that the interview was for "administrative issues only and that there was no criminal element to the interview unless you were not truthful in response to the questions that would be posed to you." Plaintiff was informed of his duty to reply to the questions and that discipline, including removal, could apply if he refused to answer.  Special Agent Hall's report indicates that she read Plaintiff his *Kalkines* warning, which warned of the potential consequences for refusing to answer or giving false answers.  Plaintiff stated repeatedly that he did not understand and refused to sign the *Kalkines* warning form, according to Special Agent Hall's report. (Doc. 73, Att. 5.)  In his response to Defendant's motion for summary judgment, Plaintiff contends that he was never read his *Kalkines/Garrity* rights and was not made aware of them until December 13, 2006 at his arbitration hearing.  (Doc. 90, pp. 7-8.)

A second round of surveillance was conducted at the parking garage on the evening of April 19, 2006 and into the morning of April 20, 2006.  At 12:45 a.m. on the morning of April 20, 2006, Plaintiff was seen arriving at the parking garage and began unloading bundles of newspapers from his van.  Plaintiff finished unloading the bundles of newspapers at 1:21 a.m.  (Doc. 73, Att. 5.)

On April 20, 2006, investigating agents met with Dr. Smin Zarandy, who also treated Plaintiff for his FMLA condition.  Dr. Zarandy saw Plaintiff on April 12, 2006 and provided Plaintiff with a note stating that he needed rest and could return to work on April 17, 2006.  Dr. Zarandy was shown the surveillance video.  Dr. Zarandy advised that Plaintiff was "exceeding what he should have been doing" and was inconsistent with what he [Plaintiff] said he could do at work. (Doc. 73, Att. 5.)

*Case No: 1:07-cv-22-SPM-GRJ*

On April 27, 2006, investigators met with Dr. Khalil Hasan concerning his treatment of Plaintiff for his FMLA condition.  Dr. Hasan stated that Plaintiff has a problem but he was exaggerating and abusing his condition.  He said Plaintiff seemed to be trying to get some benefits from the problem and that Plaintiff may want to keep the ulcer on his leg so he can show a doctor that he does have a problem. (Doc. 73, Att. 5.)

On May 4, 2006, Plaintiff went Dr. Rodriguez's office, where he was given a note clearing him to return to work on May 4, 2006.  (Doc. 73, Att. 1, 11.)  Plaintiff subsequently completed a leave request for May 3, May 4, May 5, and May 6, 2006, complaining of pain and swelling in his left leg.  (Doc. 73, Att. 12.)  Also on May 4, 2006, Special Agent Hall and ICS Young conducted their third round of surveillance of Plaintiff.  At 1:16 a.m. on the morning of May 5, 2006, Plaintiff arrived at the parking garage, this time accompanied by an unidentified male.  The unidentified male exited the vehicle and then proceeded to unload the newspaper bundles while Plaintiff remained in the driver's seat of his van.  The two left at 1:31 a.m. and Plaintiff was then spotted at the *Gainesville Sun* loading dock at 1:59 a.m.   (Doc. 73, Att. 5.)

On May 24, 2006, Special Agent Hall attempted to interview Plaintiff again.  Plaintiff was accompanied by local APWU President John Pruitt and Manager of Distribution Operations Art Greene.  (Doc. 73, Att. 1.)  Plaintiff was read and provided with a copy of a September 9, 2004 Postal Service memo stating:

> The ELM [Employee Labor Relations Manual] requirement that postal employees cooperate with postal investigations does not trump the employees' right to remain silent.  However, if investigators give employee a formal warning that the answers he gives will not be used against him in a criminal proceeding (known as "use immunity"), then the employee no longer has a right to remain silent.

(Doc. 73, Att. 14.)  Plaintiff stated that he did not understand and declined to speak to Special Agent Hall.  (Doc. 73, Att. 1.)

On June 22, 2006, Plaintiff's supervisor, Danny Anderson, conducted a factfinding interview with Plaintiff.  Also present were another supervisor in Distribution Operations and an APWU steward. Plaintiff was asked questions about his FMLA condition, his work for the *Gainesville Sun*, and the Office of the Inspector General investigations.  Plaintiff declined to answer questions during the factfinding interview. (Doc. 73, Att. 16.)

Plaintiff was advised in a letter dated July 21, 2006 that his employment with the Postal Service had been terminated for his improper conduct and his failure to cooperate in an official Postal Service investigation.  The letter stated that Plaintiff's improper conduct was his use of sick leave when he was not incapacitated for work, specifically related to his sick leave requests from April 12-17, 2006 and May 3-5, 2006. The failure to cooperate stemmed from Plaintiff's refusal to cooperate with investigators on April 19 and May 24, 2006.

Plaintiff subsequently received a Right to Sue letter from the Equal Employment Opportunity Commission (EEOC) and commenced this action on February 9, 2007. (Doc. 1.)  This case is proceeding on the Second Amended Complaint, filed January 8, 2009.  (Doc. 29.)  Plaintiff's primary argument is that he was terminated in retaliation for his previous EEO activity.  (Doc. 90.)  Defendant argues that summary judgement is due to be granted in his favor because Plaintiff's termination was based on legitimate, non-discriminatory reasons and because Plaintiff has failed to show a causal connection between the protected activity (Plaintiff's prior EEO activity) and his

termination.  (Doc. 73.)

## II.  STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving party.[2] As the Supreme Court held in *Celotex Corp. v. Catrett*,[3] the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[4]  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## III. MCDONNELL DOUGLAS FRAMEWORK

In reviewing Title VII claims that are supported by circumstantial evidence, this Court uses the three-step burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  *See also Moore v. Jefferson County Dept of*

---

[2] See Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[3] 477 U.S. 317 (1986).

[4] Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

*Case No: 1:07-cv-22-SPM-GRJ*

*Human Res.*, 277 Fed. App'x 857, 859 (11th Cir. 2008) (citing *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)). Plaintiff must first show an inference of discriminatory intent by carrying his initial burden of establishing a prima facie case of discrimination. *See, e.g., Catanzaro v. Lyons*, 232 Fed. App'x 878, 880 (11th Cir. 2007). A prima facie case of discrimination is established if the plaintiff shows: (1) he is a member of a protected class; (2) he was qualified for the position held; (3) he was other subject to adverse employment action; and (4) he was treated less favorably than a similarly situated employee outside his protected class. *Curtis v. Broward County*, 292 Fed. App'x 882, 2008 U.S. App. LEXIS 19741 (11th Cir. 2008) (citing *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003)). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Catanzaro*, 232 Fed. App'x at 880. "The most important factors in the disciplinary context. . .are the nature of the offenses committed and the nature of the punishments imposed." *Id.*

If Plaintiff meets his burden of showing a prima facie case of discrimination, then a legal presumption of discrimination arises and the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the challenged actions. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). If Defendant proffers a legitimate, non-discriminatory reason, the presumption shifts back to the Plaintiff to present evidence showing genuine issues of material fact exist as to the veracity of Defendant's proffered legitimate, non-discriminatory reasons and whether Defendant unlawfully discriminated against him. *Id.* at 1025, n. 11. So long as the employer

articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production, the inference of discrimination drops out of the case entirely, and the plaintiff has the opportunity to show by a preponderance of the evidence that the proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks, 509 U.S.502, 511 (1993).*

### III. DISCUSSION

Plaintiff alleges in his Second Amended Complaint that he was discriminated against due to his gender, race, and color ("Black") (Doc. 29, p. 3). An October 2006 EEO Dispute Resolution Specialist Inquiry Report indicates alleged discrimination on the bases of age (D.O.B. 05/29/53), physical disability ("Back") and retaliation. (Doc. 90, Att. 1, p. 1). In his February 9, 2007 Complaint, Plaintiff alleges discrimination on the bases of race, color ("Black"), disability, age, and retaliation. (Doc. 1.) In his March 21, 2007, EEOC complaint, he alleged he was subject to discrimination on the bases of age and retaliation. (Doc. 29, p. 1). Plaintiff has not pleaded specific allegations regarding the age, disability, race, color, or gender claims and has failed to plead a *prima facie* case regarding these particular allegations of discrimination. Thus, summary judgment is due to be granted in Defendant's favor on these claims, to the extent Plaintiff intended to include these as separate causes of action.

Plaintiff's suit is centered on his retaliation claim, and he argues that the investigation into his FMLA time was prompted by his previous EEO activity and his subsequent termination was done in retaliation. (Docs. 29, 90.) Plaintiff avers that he was involved in a prior EEO dispute in 2005 involving out-of-section overtime and notification from the Postal Service that he would be required to submit to a second

opinion medical examination.  (Doc. 29, p. 4; Doc. 90, p. 126 ("EEO Investigation Report".)   Plaintiff contends that management "started an investigation into my FMLA due to prior EEO activities."  (Doc. 29, p. 5.)  Plaintiff specifically bases his retaliation argument on his contention that Supervisor Art Greene, who participated in the decision to terminate Plaintiff, told the EEO that he was aware of Plaintiff's prior EEO activities.  (Doc. 29, pp. 4-5.)

"Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee (or job applicant) because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing."  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 59 (2006) (quoting § 2000e3(a)).  The Court must use the *McDonnell Douglas* burden shifting approach when a plaintiff uses circumstantial evidence to prove retaliation.  *Curtis v. Broward County, 292 Fed. App'x 882, 2008 U.S. App. LEXIS 19741, at *3.*

The first step in the *McDonnell Douglas* framework is for Plaintiff to make a *prima facie* case of retaliation.  To make a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in an activity protected by Title VII; (2) he suffered adverse action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *New v. Darnell, 2008 U.S. Dist. LEXIS 83857, *18 (N.D. Fla. 2008); Williams v. Motorola, 303 F.3d 1284, 1291 (11th Cir. 2002).*  If Plaintiff has set forth a *prima facie* case, then the Defendant must proffer a legitimate, non-discriminatory reason for the termination.  If the Defendant is successful in doing so, the Plaintiff then has the opportunity to show by a preponderance of the evidence that the

proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks*, 509 U.S.502, 511 (1993).

Plaintiff has established the first two prongs of a *prima facie* retaliation claim: his previous EEO disputes were protected activity and he suffered adverse employment action when he was fired. Defendant argues that Plaintiff's retaliation claim fails because Plaintiff cannot establish the third prong: a causal connection between his discrimination claims and his termination. "The causal connection prong requires a plaintiff to show that 'the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.'" *Curtis*, 292 Fed. App'x at *7 (quoting *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008)). As this Court has previously stated, Plaintiff's contention that Supervisor "Greene told the EEO that he was aware of Plaintiff's prior EEO activities but that he did not consider them when making the decision to terminate Plaintiff's employment. . .does not sufficiently allege a causal connection between the protected activity and the termination to warrant further consideration." (Doc. 13, p. 4) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Plaintiff's subsequent Second Amended Complaint (Doc. 29) likewise fails to sufficiently allege a causal connection between his previous EEO disputes and his termination.

However, even assuming, *arguendo*, that Plaintiff has established a *prima facie* case of retaliation, his claim fails because Defendant has presented legitimate, non-discriminatory reasons for Plaintiff's termination. First, Plaintiff submitted sick leave

requests to the Postal Service for April 11, April 12, April 13, and April 14.  (Doc. 73, Att. 6).  On the evening of April 12, 2006 and early morning hours of April 13, 2006, Plaintiff was observed unloading bundles of newspapers from his van for approximately 40 minutes, pursuant to his contract with the *Gainesville Sun*.  (Doc. 73, Att. 5.)  Plaintiff subsequently completed a leave request for May 3, May 4, May 5, and May 6, 2006, complaining of pain and swelling in his left leg.  (Doc. 73, Att. 12.)  Investigators observed Plaintiff at 1:16 a.m. on the morning of May 5, 2006 waiting in the driver's seat of his van while another male unloaded newspaper bundles; Plaintiff was later observed at the *Gainesville Sun* loading dock.  (Doc. 73, Att. 5.)  Plaintiff has not controverted these undisputed facts.

Moreover, Defendant has proffered a further legitimate, non-discriminatory reason for terminating Plaintiff. Defendant has submitted compelling evidence that Plaintiff failed to cooperate in an official investigation despite having a duty to do so. Again, there are no material disputes that Plaintiff failed to cooperate with the postal authorities in their investigation.  Finally, Plaintiff has failed to show by a preponderance of the evidence that the reasons articulated by the postal service for terminating Plaintiff were pretextual.

In sum, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to controvert Defendant's evidence that Plaintiff's termination was for legitimate non-discriminatory reasons. Simply put, there is no evidence creating a triable issue of fact that Plaintiff's termination was caused by a retaliatory motive.  Accordingly, the Defendant's motion for summary judgment  is due to be **GRANTED.**

## IV.  Recommendation

For the reasons discussed above, it is respectfully **RECOMMENDED** that Defendant's Motion For Summary Judgment (Doc. 73) should be **GRANTED.**

**IN CHAMBERS** in Gainesville, Florida this 1st day of September, 2011.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**